UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

NADINE RUDIS                              CIVIL ACTION NO. 6:20-cv-00013

VERSUS                                    JUDGE JUNEAU

U.S. COMMISSIONER,                        MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be reversed and remanded for further administrative action.

## Administrative Proceedings

The claimant, Nadine Rudis, fully exhausted her administrative remedies before filing this action. In January 2017, she filed an application for disability insurance benefits, alleging disability beginning on January 1, 2014.[1] Her application was denied.[2] She requested a hearing, which was held on November 28,

_____

[1]      Rec. Doc. 9-1 at 155.

[2]      Rec. Doc. 9-1 at 72.

2018 before Administrative Law Judge Carol Latham.[3]  The ALJ issued a decision on February 25, 2019, concluding that Ms. Rudis was not disabled within the meaning of the Social Security Act from January 1, 2014 through the date of the decision.[4]  Ms. Rudis requested that the Appeals Council review the ALJ's decision, but the council found no basis for review.[5]  Therefore, the ALJ's decision is the final decision of the Commissioner for the purpose of the Court's review.[6]  Ms. Rudis now seeks judicial review of the Commissioner's decision.

## Summary of Pertinent Facts

The claimant was born on June 7, 1964.[7]  At the time of the ALJ's decision, she was fifty-four years old and just four months shy of her fifty-fifth birthday.  She graduated from high school and attended one year of college.[8]  She has relevant work experience in banking and sales.[9]  She alleged that she has been disabled since

---

[3]     A transcript of the hearing is found in the record at Rec. Doc. 9-1 at 37-63.

[4]     Rec. Doc. 9-1 at 26.

[5]     Rec. Doc. 9-1 at 4.

[6]     *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]     Rec. Doc. 9-1 at 39, 155.

[8]     Rec. Doc. 9-1 at 41, 190.

[9]     Rec. Doc. 9-1 at 41-46, 190.

January 2014 due to arthritis, back problems, depression, sleep disorders including insomnia and sleep apnea, anxiety, and breast cancer.[10]

The medical records made a part of the administrative record in this matter show that Ms. Rudis treated with her primary care physician, Dr. Theodore W. DeBlanc at the Internal Medicine Clinic of Opelousas, Louisiana, from April 2014 through September 2018. Dr. DeBlanc treated Ms. Rudis for a severe depressive disorder (including suicidal ideation), chest pain, irritable bowel syndrome, arthritis, dysphagia, insomnia, seizure-like activity, and lumbar disc disease as well as other illnesses unrelated to her disability claim.[11] In May and June 2014, Ms. Rudis underwent diagnostic testing of her heart at Cardiovascular Institute of the South.[12] On November 20, 2015, Ms. Rudis was diagnosed with Bell's palsy after presenting at Opelousas General Hospital with a complaint of facial drooping.[13] In June 2016, Ms. Rudis saw Dr. Tiffany Liu, at the Neurology Clinic of Opelousas.[14] Dr. Liu's primary diagnosis was syncope and collapse but she planned to do an EEG to rule out seizures because she found Ms. Rudis's recurrent syncope spells to be slightly

---

[10]     Rec. Doc. 9-1 at 189.

[11]     Rec. Doc. 9-1 at 257-284, 342-370, 469-498, 588-643.

[12]     Rec. Doc. 9-1 at 572-585.

[13]     Rec. Doc. 9-1 at 428-437.

[14]     Rec. Doc. 9-1 at 528-529.

atypical for seizures.  In August 2016, Ms. Rudis underwent a right breast partial mastectomy due to breast cancer.[15]

On November 28, 2018, Ms. Rudis testified at a hearing regarding her symptoms, her medical treatment and her functionality.  She stated that she was not receiving any type of mental health treatment despite her oncologist having recommended that she see a psychiatrist, but also stated that she was currently and had been for about twenty-five years taking medication for her mental health impairments.  She stated that she was also taking seizure medication for the transient ischemic attacks ("TIAs" or mini-strokes) that she was having.  She testified that she had used a cane for about five years when "out and about" to help prevent falls.

Ms. Rudis testified that her last employment had been at Stemmans Horse Supply and that her employment ended when she "kind of had a nervous breakdown and I walked out."  She stated that after her last TIA, in October 2018, her husband sold her car and does not permit her to drive even though she still has a driver's license.  She complained about having recurrent bladder infections.  She stated that some of her medications cause drowsiness, nausea, throwing up, and shaking.  She testified that her breast cancer was in remission but that she had continuing stomach issues including diverticulitis and irritable bowel syndrome.  She stated that she had

---

[15]    Rec. Doc. 9-1 at 325.

seen a chiropractor in March 2018 due to back problems including her pelvis popping out of joint and her right side being significantly shorter than the left. She stated that she had previously had unsuccessful physical therapy for her back. When asked to explain why she could not work, she listed brain fog, difficulty concentrating, and difficulty focusing. She stated that she takes approximately eleven prescription medications every day.

Ms. Rudis testified that she cares for her dog, cleans her house slowly and with frequent breaks, prepares simple meals for her husband and herself, grocery shops along with her husband because she no longer drives, and engages in no recreational or social activities. She stated that she takes care of her own personal grooming and hygiene and uses a shower chair because she fell in the shower three times in the previous year. She stated that she gets agitated with other people fairly easily, sometimes has problems making decisions, and can lift only about three pounds due to arthritis in her wrists. She also complained about arthritis in her ankles. She estimated that she can sit about an hour at a time, can stand about half an hour at a time, and can walk maybe a block or a half block. She stated that she can no longer crochet due to pain in her hands.

## Analysis

**A.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[16] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[17]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[18]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[19]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[20]  Conflicts in

---

[16]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[17]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[18]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[19]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[20]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[21] and credibility assessments[22] are for the Commissioner to resolve, not the courts. Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination: (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[23]

## B.    **Entitlement to Benefits**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[24] A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[25] A claimant is disabled only if his physical or mental impairments are so severe that he is unable to not only do his previous work, but cannot,

---

[21]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[22]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[23]    *Wren v. Sullivan*, 925 F.2d at 126.

[24]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[25]    42 U.S.C. § 1382c(a)(3)(A).

considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[26]

## C.   <u>Evaluation Process and Burden of Proof</u>

A five-step inquiry is used to determine whether a claimant is disabled, requiring the Commissioner to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[27]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[28] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[29]  The claimant's residual functional capacity is used at the fourth step to

---

[26]    42 U.S.C. § 1382c(a)(3)(B).

[27]    20 C.F.R. § 404.1520.

[28]    20 C.F.R. § 404.1520(a)(4).

[29]    20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[30]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[31]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[32]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[33]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[34]

---

[30]    20 C.F.R. § 404.1520(e).

[31]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[32]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[33]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[34]    *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

**D.**    <u>**The ALJ's Findings and Conclusions**</u>

The ALJ determined, at step one, that Ms. Rudis did not engage in substantial gainful activity after January 1, 2014. This finding is supported by substantial evidence in the record.

At step two, the ALJ found that Ms. Rudis has the following severe impairments: arthritis, degenerative disc disease of the lumbar spine, peripheral artery disease, and a seizure disorder. This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Ms. Rudis has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. The claimant did not challenge this finding.

The ALJ found that Ms. Rudis has the residual functional capacity to perform light work except that she should avoid all exposure to workplace hazards such as dangerous, moving machinery and unprotected heights. The claimant challenged this finding.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work. The claimant did not challenge this finding.

At step five, the ALJ found that Ms. Rudis was not disabled from her alleged disability onset date through the date of the decision because there are jobs in the national economy that she can perform. The claimant challenged this finding.

**E.**    **The Allegations of Error**

The claimant contends that the ALJ erred (1) by failing to consider Ms. Rudis's borderline age; (2) by failing to consider Ms. Rudis's mental limitations when evaluating her residual functional capacity; and (3) by failing to develop the record, relying instead upon her own lay judgment in evaluating Ms. Rudis's residual functional capacity.

**F.**    **Did the ALJ Properly Consider the Claimant's Age?**

The ALJ found that Ms. Rudis had no significant nonexertional limitations, found that she was capable of light work, and applied the Grid Rules at Step Five of the sequential analysis to find that Ms. Rudis was not disabled.  But the ALJ's ruling failed to take into consideration Ms. Rudis's age.  Ms. Rudis was fifty-two years old when she applied for SSI benefits, she was fifty-four years old when she testified at the hearing, and she was approximately four months shy of her fifty-fifth birthday when the ALJ issued her ruling.  Ms. Rudis argued that this was a borderline age situation, in which the ALJ should have considered whether the claimant should be deemed as having already progressed from the "approaching advanced age" category to the "advanced age" category under the Medical-Vocational Guidelines of the Social Security regulations (also known as the Grid Rules).

The Grid Rules, which are found at 20 C.F.R. Part 404, Subpart P, Appendix 2, were designed to improve the uniformity and the efficiency of an ALJ's Step Five

11

determination.[35]  The Grid Rules are a matrix of the four factors – physical ability, age, education, and work experience – that are used to determine whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy.[36]   When a claimant's qualifications correspond to the job requirements identified in a Grid Rule, the rule directs a mandatory conclusion as to whether work exists that the claimant could perform; if such work exists, the claimant is not considered disabled.[37]   The Grid Rules recognize that when a claimant is considered to be of "advanced age," he has reached the point at which "age significantly affects a person's ability to do substantial gainful activity."[38]  Any determination dictated by the Grid Rules is conclusive and cannot be disregarded on the basis of testimony from a vocational expert.[39]   "There is no provision in either the Social Security Act or the regulations for an ALJ to rebut a conclusion of disabled in the grids by the use of vocational expert testimony."[40]

---

[35]     *Heckler v. Campbell*, 461 U.S. 458, 461 (1983).

[36]     *Heckler v. Campbell*, 461 U.S. at 461.

[37]     *Heckler v. Campbell*, 461 U.S. at 462.

[38]     20 C.F.R. § 404.1563.

[39]     20 C.F.R. § 404.1569.

[40]     *Ware v. Colvin*, No. 3-12-CV-291-RFC, 2014 WL 4999276, at *11 (W.D. Tex. Oct. 7, 2014) (citing SSR 83–5a, 1983 WL 31250); and *Horsley v. Colvin*, No. 1:12-CV-273-DAS, 2014 WL 1213467 at *5 (N.D. Miss, Mar. 24, 2014)).

The Social Security regulations specifically address how the Grid Rules should be applied when a claimant's age will soon place him in another category.

> We will not apply the age categories mechanically in a borderline situation. If you are within a few days to a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.[41]

Thus, a "borderline situation" exists when the claimant is within a few days to a few months of the next older age category and applying the Grid Rules for the older age category would result in a determination that the claimant is disabled. When those two conditions are met, the ALJ must consider whether the next higher age category should be used.

Adjudicators are required to use "the age categories that apply to you during the period for which we must determine if you are disabled."[42] In this case, the claimant's chronological age remained in the "closely approaching advanced age" category through the date of the ALJ's decision, but she aged into the "borderline range" during the pendency of her application. Neither the Social Security Administration nor the courts have defined precisely what set of circumstances

---

[41]    20 C.F.R. § 416.963(b).

[42]    20 C.F.R. § 404.1563(b).

create a borderline situation.[43]  The absence of a clear definition means that the Commissioner has significant discretion to determine when a situation is borderline.[44]  As a general rule, however, a person who is within six months of the next higher age category is considered to be in a borderline situation.[45]  When a borderline situation exists, the ALJ is required to "consider whether to use the older age category after evaluating the overall impact of all the factors of [the claimant's] case."[46]  Furthermore, case law dictates that the age to be applied in making a grid determination is the age at the time of the decision – not at the alleged date for onset of disability or the date of application.[47]

In her written ruling, the ALJ did not specifically address the claimant's borderline age situation.  The ALJ noted that the claimant was born on June 7, 1964 and was 49 years old on the alleged disability onset date,[48] but she did not mention

---

[43]    *Parker v. Colvin*, No. 5:13-cv-54(DCB)(MTP), 2014 WL 4639452, at *12 (S.D. Miss. Sept. 16, 2014) (citing *Walhood v. Secretary of Health and Human Services*, 875 F.Supp 1278, 1284 (E.D. Tex. 1995)).

[44]    *Stanridge-Salazar v. Massanari*, 254 F.3d 70, at *2 (5th Cir. 2001) (per curiam) (citing *Harrell v. Bowen*, 862 F.2d 471, 479 (5th Cir. 1998)).

[45]    See, e.g., *Parker v. Colvin*, 2014 WL 4639452, at *12, and the cases cited there.

[46]    20 C.F.R. § 416.963(b).

[47]    *Walhood v. Sec. of Health & Human Services*, 875 F. Supp. 1278, 1284 (E.D. Tex. 1995) (citing *Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 780 (6th Cir. 1987)).

[48]    Rec. Doc. 9-1 at 25.

the claimant's age at the time of the hearing or at the time the ruling was issued, nor did she mention the proximity of the claimant's upcoming birthday.

The ALJ stated that she based her decision on Grid Rules 202.21, 202.14, and SSR 85-15. SSR 85-15 addresses using the Grid Rules as a framework for evaluating solely nonexertional impairments. Because the ALJ found that Ms. Rudis's nonexertional limitations had no significant adverse effect on the light and sedentary job base, she explained that she was allowed to apply the Grid Rules without input from the vocational expert. Under Rule 202.21, a person who is under age fifty, has a high school education or more, has nontransferable skills – but is capable of light work – is not disabled.[49] Under Rule 202.14, a person who is age fifty to fifty-four, has a high school education or more but lacks recently completed education providing for direct entry into skilled work, and has nontransferable skills – but is capable of light work – is not disabled.[50] The ALJ concluded – in reliance on the Grid Rules and without input from the vocational expert – that "considering the claimant's age, education, work experience, and residual functional capacity, she is capable of making a successful adjustment to other work that exists in significant

---

[49]    Medical-Vocational Rule 202.21, 20 C.F.R. Pt. 404, Subpt. P, Appendix 2.

[50]    Medical-Vocational Rule 202.14, 20 C.F.R. Pt. 404, Subpt. P, Appendix 2.

numbers in the national economy."[51]  The ALJ did not mention the fact that Ms. Rudis would reach "advanced age" less than six months after the ruling was issued.

The Commissioner argued that the ALJ's error was harmless because "Ms. Rudis may not have been found disabled if she had been age 55."[52]  In support of that argument, the Commissioner noted that if Rule 202.06 were applied instead of those cited by the ALJ, Ms. Rudis would be found disabled but if Rule 202.08 were applied, she would have been found not disabled.  Rules 202.06 and 202.08 both apply to persons aged fifty-five or older.  The difference between them is whether the claimant has had recent education that provides for direct entry into skilled work.[53]  Here, there is no indication in the record that Ms. Rudis has had any vocational training since graduating from high school many years ago.  Therefore, it is not likely that the ALJ would have applied Rule 202.08.  And if the ALJ had applied Rule 202.06, a finding that Ms. Rudis is disabled would be mandated.  In a

---

[51]     Rec. Doc. 9-1 at 26.

[52]     Rec. Doc. 13 at 7.

[53]     Social Security Ruling 83-10, 1983 WL 31251, at *8.  "The criterion of 'high school graduate or more--provides for direct entry into skilled work' is met when there is little time lapse between the completion of formal education and the date of adjudication, and where the content of the education would enable individuals, with a minimal degree of job orientation, to begin performing the skilled job duties of certain identifiable occupations within their RFC."

case presenting a similar error by the ALJ, the Fifth Circuit recently ruled that the error was not harmless.[54]

This Court finds that there is nothing in the ALJ's ruling to indicate that the ALJ recognized or considered the claimant's borderline age situation, as required by the regulations.  In fact, this Court finds no evidence in the record showing that the ALJ considered the fact that the claimant would soon have her fifty-fifth birthday.  Because the ALJ did not acknowledge or discuss the claimant's borderline age situation, this Court further finds that the Grid Rules were applied mechanically and in violation of the relevant regulation.  Because application of the older age category might have changed the outcome of this case, this Court is unable to conclude that the error was harmless.  Under the circumstances of this case, this Court cannot conclude that the ALJ's decision is supported by substantial evidence.[55]  Therefore, this Court will recommend that the Commissioner's decision should be vacated and this matter remanded for further proceedings.

---

[54]    *Schofield v. Saul*, 950 F.3d 315, 321-22 (5th Cir. 2020).

[55]    *Schofield v. Saul*, 950 F.3d at 322.

### G.    Did the ALJ Err in Evaluating the Claimant's Residual Functional Capacity?

The claimant's second argument is that the ALJ failed to consider her mental impairments – which the ALJ found to be nonsevere – when making her residual functional capacity evaluation.  This Court agrees.

A residual functional capacity assessment "is a determination of the most the claimant can still do despite his physical and mental limitations and is based on all relevant evidence in the claimant's record."[56]    The ALJ is responsible for determining a claimant's residual functional capacity.[57]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[58]  The evaluation of a claimant's subjective symptoms is a task particularly within the province of the ALJ who has had an opportunity to observe whether the person seems to be disabled.[59]  In making a residual functional capacity assessment, an ALJ must consider all symptoms and the extent to which the symptoms can reasonably be accepted as

---

[56]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[57]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[58]    *Martinez v. Chater*, 64 F.3d at 176.

[59]    *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Loya v. Heckler*, 707 F.2d 211, 215 (5th Cir. 1983).

consistent with the objective medical evidence and other evidence. The ALJ must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not severe.[60]

In this case, the ALJ found that "the claimant has the residual functional capacity to perform light work. . . except that she should avoid all exposure to workplace hazards, such as dangerous, moving machinery[,] and unprotected heights."[61]   In analyzing the claimant's residual functional capacity, the ALJ mentioned the claimant's depressive disorder and the medications she takes for that disorder. She also mentioned other of the claimant's conditions that she found to be nonsevere including but not limited to obesity, irritable bowel syndrome, and diverticulitis. In a conclusory fashion, the ALJ ended her analysis by saying that she "considered all limitations in formulating the residual functional capacity" assessment.[62] But in specifically articulating her finding, the ALJ said something very different. She said: "The undersigned finds the claimant, *based on her severe impairments and its related symptoms*, is capable of performing light work, so long as she avoids all exposure to workplace hazards, such as dangerous, moving

---

[60]     *Giles v. Astrue*, 433 Fed. App'x 241, 245 (5th Cir. 2011) (citing 20 C.F.R. § 404.1545).

[61]     Rec. Doc. 9-1 at 22.

[62]     Rec. Doc. 9-1 at 24.

machinery and unprotected heights."[63]  Thus, despite her purported consideration of all of the claimant's limitations and despite her mentioning of some of the claimant's nonsevere impairments, the ALJ expressly stated that her residual functional capacity finding was based solely on the claimant's severe impairments and the symptoms related to those impairments.  In her own words, the ALJ unequivocally stated that she did not factor the claimant's nonsevere mental impairment into her residual functional capacity calculation.  This was error since an ALJ is required to consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not severe.  Furthermore, the "ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision."[64]

Although the ALJ found that the claimant's mental impairments were mild and not severe, it is conceivable that including those impairments in the residual functional capacity calculus might have resulted in the ALJ's reaching a different conclusion.  The possibility exists that failing to consider the claimant's mental impairments and other nonsevere impairments resulted in a residual functional capacity that overestimated the claimant's abilities.  In the Fifth Circuit, harmless error exists when it is inconceivable that a different administration conclusion would

---

[63]     Rec. Doc. 9-1 at 24 [emphasis added].

[64]     *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000).

have been reached absent the error.[65]   Accordingly, the ALJ's failure to apply the correct legal standard in analyzing the claimant's residual functional capacity was not a harmless error, and remand is required.

## H.   Did the ALJ Fail to Develop the Record?

The claimant's final argument is that the ALJ relied solely upon her own lay judgment in evaluating Ms. Rudis's residual functional capacity since the record contains no medical opinions regarding the functional limitations arising from Ms. Rudis's medical conditions.  On June 8, 2017, the state agency medical consultant noted that the "claimant has failed to return functional and work information after several attempts to contact her and third party.  There is insufficient evidence to assess her functional capacity.  Therefore, disability cannot be established."[66]  The ALJ stated in her ruling, however, that "[w]hile that may have been true at the time the assessment was to have been rendered, the undersigned finds sufficient evidence to assessed [sic] a residual functional capacity herein."[67]   However, the record contains no functional analysis report submitted by the claimant or by any of her treating physicians.  Similarly, the treatment notes from Ms. Rudis's physicians

---

[65]      See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

[66]      Rec. Doc. 9-1 at 68.

[67]      Rec. Doc. 9-1 at 24.

contain no analysis of how her various medical conditions affect her ability to function.

An "ALJ may not – without opinion from medical experts – derive the applicant's residual functional capacity based solely on evidence of his or her claimed medical conditions."[68]  For that reason, the Fifth Circuit has cautioned ALJs not to play doctor or substitute their own evaluations of the evidence for that of the physicians who actually treated or examined the claimant.[69]  Indeed, the appellate court has noted that common sense can mislead and lay intuition about medical phenomena are often wrong.[70]  Thus, neither the ALJ nor the court is free to substitute its own opinion for that of medical professionals.[71]

In this case, however, the only things underlying the ALJ's residual functional capacity findings are the claimant's testimony at the hearing and the ALJ's own assessment of how the claimant's medical conditions affect her functionality.  While an ALJ has the power to evaluate a claimant's functional capacity, that evaluation

---

[68]    *Williams v. Astrue*, 355 Fed. App'x 828, 832 & n. 6 (5th Cir. 2009) (citing *Ripley v. Chater*, 67 F.3d 552, 557-58 (5th Cir. 1995)).

[69]    See *Frank v. Barnhart*, 326 F.3d at 622 (citing *Schmidt v. Sullivan*, 914 F.2d 117, 188 (7th Cir. 1990)).

[70]    *Frank v. Barnhart*, 326 F.3d at 622.

[71]    *Potier v. U.S. Commissioner, Social Security Administration*, No. 16-cv-00144, 2017 WL 1103470, at *8 (W.D. La. Feb. 23, 2017) (citing *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6, n. 6 (M.D. La. Sept. 4, 2014)).

must be based on medical opinions. But there are no underlying medical opinions in the record. Additionally, there are deficits in the treatment notes. For example, Dr. DeBlanc noted on several occasions that he was treating Ms. Rudis for arthritis, but he did not state which parts of her body are affected by the arthritis. The ALJ noted in her ruling that Dr. DeBlanc diagnosed Ms. Rudis with lumbar disc disease but the record contains no clinical findings supporting that diagnosis. When Ms. Rudis saw Dr. DeBlanc on March 26, 2014, she was frequently thinking about suicide with a plan. Dr. DeBlanc described her depression as severe, and at various times he prescribed medications for her depression and anxiety including Abilify, Wellbutrin, Celexia, Brintellix, Alprazolam, Pristiq, and Lexapro. But Dr. DeBlanc did not opine on how any of these conditions affected Ms. Rudis's ability to work or to function in society.

The ALJ "has a duty to fully and fairly develop the facts relative to a claim for disability benefits,"[72] and the Fifth Circuit will reverse an ALJ's decision if the claimant shows (1) that the ALJ failed in his duty to fully and fairly develop the record and (2) the claimant was prejudiced thereby.[73] Prejudice can be established

---

[72]    *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir .2000).

[73]    *Carey v. Apfel*, 230 F.3d at 142.

by showing that, had the ALJ adequately performed his duty, he "could and would have adduced evidence that might have altered the result."[74]

Consistent with the duty to develop the record, the ALJ may not be required to recontact a medical source when the evidence already obtained from that source is inadequate for the ALJ to determine whether the claimant is disabled,[75] and consultative examinations are required only if the record establishes that such an examination is necessary to enable the ALJ to make the disability decision.[76]  The ALJ's duty to develop the record must also be balanced against the fact that claimants bear the burden of proof up through Step Four of the evaluation process.[77]

In this case, Ms. Rudis drew particular attention to her claimed mental impairments.  The treatment notes in the record show that she was treated for depression from 2014 through 2018, she was suicidal on at least one occasion, and her depression was described by her treating physicians as severe.  She testified that she took medication for her mental impairments for about twenty-five years, Dr. DeBlanc prescribed several different medications for her mental conditions, and she

---

[74]    *Cornett v. Astrue*, 261 Fed. App'x 644, 647 (5th Cir. 2008) (quoting *Kane v. Heckler*, 731 F.2d 1216, 1220 (5th Cir. 1984)).

[75]    See *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

[76]    *Hardman v. Colvin*, 820 F.3d 142, 148 (5th Cir. 2016).

[77]    *Holifield v. Astrue*, 402 Fed. App'x 24, 26 (5th Cir. 2010) (citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007)).

testified that her oncologist had recommended that she see a psychiatrist.  But the record contains no psychological evaluation.  The Fifth Circuit requires development of the record "when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment."[78]   Since there is no information in the record as it currently exists from any physician regarding the functional effect of Ms. Rudis's depression or her other claimed mental health impairments, this is the type of case in which a consultative examination by a psychologist or psychiatrist would assist the ALJ in determining whether Ms. Rudis is disabled.  Absent such assistance, the ALJ used only her own judgment to determine that Ms. Rudis's mental health impairments were not severe and failed to include them in her residual functional capacity evaluation.   Additionally, the ALJ crafted a residual functional capacity assessment based on her own evaluation of Ms. Rudis's functionality without any assistance from any medical professional's opinions.  This was error, and it was not harmless.  Had the ALJ obtained a consultative examination from a psychologist or psychiatrist and a functional evaluation from the claimant's primary care physician, her finding on the claimant's residual functional capacity might have been different. Accordingly, remand for development of the record is necessary.

---

[78]    *Clary v. Barnhart*, 214 Fed. App'x 479, 481 (5th Cir. 2007) (citing *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996)).

## Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (a) consider whether the claimant's borderline age requires a different disability finding at Step Five; (b) reevaluate the claimant's residual functional capacity in light of all of her impairments, whether severe or not; and (c) fully develop the record by obtaining a functional analysis from a treating physician and a consultative examination by a psychologist or psychiatrist.  The claimant should be allowed to update the record and to testify at another hearing.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[79]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[79]   See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[80]

Signed in Lafayette, Louisiana, this 9th day of December 2020.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[80]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).